# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DEBORAH ANN VACCO,

     Plaintiff,

     v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

     Defendant.

No. 14 C 1139

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Deborah Ann Vacco filed this action seeking reversal of the final deci-
sion of the Commissioner of Social Security denying her applications for Disability
Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C.
§§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United
States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a
request to reverse the ALJ's decision and remand for additional proceedings. For
the reasons stated below, the case is remanded for further proceedings consistent
with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that
he or she is disabled within the meaning of the Act.[1] *York v. Massanari*, 155 F.

---

[1] The regulations governing the determination of disability for DIB are found at 20
C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that

Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v.* Apfel, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on February 11, 2009, alleging that she became disabled on July 21, 2008, because of fibromyalgia, high blood pressure, broken leg, increased stiffness, swelling and pain in both hands, and depression. (R. at 107, 133, 142, 357–61). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 107–08, 129–33, 139–42, 145). On April 7, 2010, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 62–106). The ALJ also heard testimony from Carol A. Strasser, Plaintiff's mother, Aimee Mowery, a vocational expert (VE), and Ashok Jilhewar, M.D., a medical expert (ME). (*Id.* at 62–106, 186–88, 422). The ALJ denied Plaintiff's request for benefits on June 17, 2010. (*Id.* at 112–19). Plaintiff filed a timely request for review of the ALJ's decision, and on November 23, 2011, the Appeals Council vacated the June 2010 decision and remanded the case for further proceedings. (*Id.* at 124–27). On September 10, 2012, Plaintiff, represented by counsel, testified at another hearing before the ALJ. (*Id.* at 18, 31–61). The ALJ also heard testimony from James Breen, a VE, and John W. Pollard, M.D., an ME. (*Id.* at 18, 31–61, 322–24).

The ALJ again denied Plaintiff's request for benefits on October 9, 2012. (R. at 18–23). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since July 21, 2008, the alleged onset date. (*Id.* at 20). At step two, the ALJ found that Plaintiff's low back and knee pain, diabetes mellitus, fibromyalgia, history of carpal tunnel

syndrome, hyperlipidemia, hypertension, depression, and anxiety are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 20–21).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she can perform light work involving: "sitting, standing and/or walking up to 6 hours in an 8-hour workday; occasional crawling, crouching, kneeling and squatting." (R. at 21). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is capable of performing past relevant work as a cashier and office clerk. (*Id.* at 23). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability, as defined by the Act. (*Id.*).

The Appeals Council denied Plaintiff's request for review on December 19, 2013. (R. at 1–4). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regula-

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

tions. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*,

763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff began monthly treatments with Francis S. Lichon, M.D., in September 2008. (R. at 618). On September 2, 2008, Plaintiff presented with severe joint pain and some swelling. (*Id.* at 577). Dr. Lichon increased her Prednisone dosage. (*Id.*). On February 10, 2009, Plaintiff complained of severe fatigue and pain in both wrists and knees. (*Id.* at 582). Dr. Lichon continued tramadol.[3] (*Id.*). On February 24, 2009, Dr. Lichon noted positive trigger points and diagnosed fibromyalgia and osteoarthritis of her knees.[4] (*Id.* at 583). On March 18, 2009, Dr. Lichon noted positive trigger points, diagnosed fibromyalgia, anxiety and depression, and increased the Lyrica dosage.[5] (*Id.* at 584).

On April 20, 2009, Ravikiran N. Tamragouri, M.D., performed a consultative examination. (R. at 586–89). Plaintiff complained of fibromyalgia, with pain in her

---

[3] Tramadol is a narcotic-like pain reliever, which is used to treat moderate to severe pain. <www.drugs.com>

[4] "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals. . . . In the past, doctors would check 18 specific points on a person's body to see how many of them were painful when pressed firmly. Newer guidelines don't require a tender point exam. Instead, a fibromyalgia diagnosis can be made if a person has had widespread pain for more than three months—with no underlying medical condition that could cause the pain." <http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243> [hereinafter Mayo Clinic: Fibromyalgia]

[5] Lyrica (pregabalin) affects chemicals in the brain that send pain signals across the nervous system. <www.drugs.com>

neck, back, knees, and other muscles. (*Id.* at 586). On examination, Plaintiff complained of pain with movement of all her joints. (*Id.* at 588). She has pain and tenderness with minimal pressure over the usual trigger points in her shoulders, neck, para-lumbar spine muscles, and knees. (*Id.*). Dr. Tamragouri diagnosed myofascial pain,[6] hypertension, and a history of depression. (*Id.* at 588–89).

On April 28, 2009, Plaintiff complained of increased pain related to weather changes. (R. at 631). Dr. Lichon noted positive trigger points and diagnosed fibromyalgia and depression. (*Id.*). On June 9, 2009, Plaintiff reported doing well (*id.* at 632), but a month later, she complained of severe pain and swelling in her left knee (*id.* at 633).

On June 27, 2009, Dr. Lichon submitted a fibromyalgia RFC questionnaire. (R. at 618–22). He diagnosed fibromyalgia and fatigue and noted that Plaintiff meets the American College of Rheumatology criteria for fibromyalgia. (*Id.* at 618). Plaintiff's symptoms include multiple trigger points, nonrestorative sleep, chronic fatigue, morning stiffness, irritable bowel syndrome, numbness and tingling, depression, and carpal tunnel syndrome. (*Id.*). Dr. Lichon opined that Plaintiff's pain is severe enough to cause constant interference with the attention and detail needed to perform even simple work tasks, and she is incapable of even performing low stress jobs. (*Id.* at 619). As a result of Plaintiff's impairments, Dr. Lichon estimated that

---

[6] "Myofascial pain syndrome is a chronic pain disorder, in which pressure on sensitive points in the muscles (trigger points) causes pain in seemingly unrelated parts of the body. . . . Treatment options for myofascial pain syndrome include physical therapy and trigger point injections. . . . Some research suggests that myofascial pain syndrome may develop into fibromyalgia in some people." < www.mayoclinic.org/diseases-conditions/ myofascial-pain-syndrome> [hereinafter Mayo Clinic: Myofascial Pain Syndrome]

Plaintiff can walk one-half block before needing to rest, sit only two hours before needing to get up, and stand 15 minutes before needing to sit. (*Id.* at 620). During an eight-hour workday, Dr. Lichon concluded that Plaintiff can stand/walk less than two hours and sit about two hours. (*Id.*). Plaintiff will need a job that permits shifting at will from sitting, standing or walking, allows unscheduled breaks up to 20 minutes every two hours, and permits her legs to be elevated up to 45°. (*Id.*). Dr. Lichon opined that Plaintiff can occasionally lift less than 10 pounds, has significant limitations with reaching, handling or fingering, cannot grasp, turn or twist objects with her hands, and cannot reach overhead. (*Id.* at 621). Plaintiff will have good days and bad days and will likely miss more than four days a month because of her impairments. (*Id.*).

On September 11, 2009, Plaintiff reported left knee pain. (R. at 642). On examination, Dr. Lichon noted positive trigger points. (*Id.*). On November 20, 2009, Plaintiff reported joint and muscle pain. (*Id.* at 644). Dr. Lichon noted positive trigger points. (*Id.*). By December 4, 2009, Plaintiff was taking up to 400 mg of tramadol a day in an effort to alleviate her pain. (*Id.*).

On March 11, 2010, Dr. Lichon submitted a second fibromyalgia RFC questionnaire. (R. at 651–56). He diagnosed fibromyalgia and depression. (*Id.* 651). Plaintiff's symptoms include chronic aches and pains, insomnia, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, numbness and tingling, anxiety, panic attacks, and depression. (*Id.*). Based on his clinical findings, including multiple trigger points on examination and emotional factors, Dr.

Lichon concluded that Plaintiff's prognosis is "poor." (*Id.* at 651–52). Plaintiff's pain, which can be severe and incapacitating, is focused in her lumbosacral spine, chest, legs, knees, ankles, and feet. (*Id.* at 652). Dr. Lichon opined that Plaintiff's pain is severe enough to cause constant interference with the attention and detail need to perform even simple work tasks and she is incapable of performing even low stress jobs. (*Id.* at 653). She can walk one block at best without rest, sit or stand only 15 minutes before needing to change position, and can sit, stand, or walk less than 2 hours in an 8-hour workday. (*Id.*). Plaintiff needs a job which permits shifting positions at will and allows frequent unscheduled breaks. (*Id.* at 654). Her impairments will likely produce good days and bad days and she is likely to miss more than four days a month. (*Id.* at 655). In sum, Dr. Lichon opined that Plaintiff "is totally disabled [and] unable to work due to fibromyalgia [and] depression." (*Id.* at 656).

On April 9, 2010, Winston Sequeira, M.D., performed a consultative examination after a referral by Laura A. Oswald, D.O., Plaintiff's general practitioner. (R. at 758–62). Plaintiff reported intermittent occipital headaches, fatigue, and shortness of breath. (*Id.* at 759). She has mild to severe pain in her chest, joints, lower back, shoulders, knees, wrists and thumbs, along with morning stiffness. (*Id.*). She has difficulty dressing herself, taking a shower, getting into a car or onto a bus, walking, and sleeping. (*Id.*). On examination, her joints were tender but not swollen, with full range of motion and a normal straight leg raising (SLR) of both lower extremities. (*Id.* at 761–62). Dr. Sequeira found multiple tenderness points over the trapezius muscles and over the sacroiliac joints. (*Id.* at 762). He could not identify

the cause of her diffuse myalgias and arthralgias and severe pain and stiffness. (*Id.*). However, "[w]ith the multiple tender points, [he] agree[d] with a diagnosis of fibromyalgia." (*Id.*).

Plaintiff began quarterly treatments with Jay J. Seymour, M.D., in 2005. (R. at 952). On April 10, 2010, Plaintiff complained that her pain medications were not working. (*Id.* at 771–72). On examination, she was positive for myalgias, back pain, and joint pain. (*Id.* at 774). Dr. Seymour noted that she was distressed, upset, and tearful, complaining that "everything hurts." (*Id.*). He diagnosed fibromyalgia and insomnia, discontinued tramadol, and prescribed Flexeril and Lidoderm patches.[7] (*Id.*). A week later, Plaintiff reported general malaise and fatigue. (*Id.* 785). On examination, she had normal gait but was positive for myalgias, joint pain, and depression. (*Id.* at 785–86). Dr. Seymour diagnosed fibromyalgia, insomnia, knee pain, upper back pain and hypertension, and referred her for physical therapy. (*Id.* at 786–87). On June 14, 2010, Plaintiff reported that her back and neck pain is chronic, with pain level reaching 10/10 when she tries to walk. (*Id.* at 797). On examination, she had normal range of motion and gait. (*Id.* at 799). Dr. Seymour diagnosed fibromyalgia, insomnia and low back pain, and recommended that Plaintiff continue with water therapy. (*Id.* at 799–800).

On January 31, 2011, Plaintiff reported myalgias and joint pain. (R. at 831). On examination, she exhibited normal range of motion in the neck and lumber back,

---

[7] Flexeril (cyclobenzaprine) works by blocking nerve impulses (or pain sensations) that are sent to the brain. Lidoderm is a local anesthetic which works by blocking nerve signals and is used to relieve pain. <www.drugs.com>

with no tenderness, no bony tenderness, no swelling, no edema, no deformity and no pain or spasm, but she did exhibit a slow gait due to her pain. (*Id.*). Dr. Seymour prescribed cyclobenzaprine and clonazepam. (*Id.* at 833). On April 27, 2011, Plaintiff reported that her knee pain is chronic and rapidly worsening, with associated arthralgias and myalgias. (*Id.* at 836). On examination, she had an antalgic gait. (*Id.* at 839). An MRI of Plaintiff's right knee taken on May 6, 2011, revealed a large joint effusion, along with osteoarthritis with osteophytosis, grade 4 chondromalacia of the lateral patellar facet, and degenerative change with type 1 meniscal signal in the posterior horn of the medial meniscus. (*Id.* at 948–49). On June 22, 2011, she reported doing better; she had normal range of motion. (*Id.* at 861). On March 19, 2012, Plaintiff reported chronic knee pain, along with arthralgias, myalgias, malaise, and fatigue. (*Id.* at 896). On examination, her gait was normal. (*Id.* at 899). On May 30, 2012, Plaintiff saw Dr. Oswald for a medication follow-up. (*Id.* at 917). On examination, she exhibited a normal range of motion and gait. (*Id.* at 920).

On June 18, 2012, Dr. Seymour completed a fibromyalgia RFC questionnaire. (R. at 952–56). In addition to Plaintiff meeting the American College of Rheumatology criteria for fibromyalgia, she also has hypertension, diabetes, GERD, depression, and insomnia. (*Id.* 952). Her symptoms include multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, numbness and tingling, breathlessness, anxiety, depression, and a history of carpal tunnel syndrome. (*Id.*). Dr. Seymour opined that Plaintiff suffers from daily, severe pain, which, together with emotional factors, will constantly interfere with the at-

tention and concentration needed to perform even simple work tasks, and she is incapable of performing even low stress jobs. (*Id.* at 953). He concluded that without rest, Plaintiff can walk 2 city blocks, sit 45 minutes, and stand 15 minutes. (*Id.* at 954). She needs a job that allows shifting positions at will, occasional use of a cane, and unscheduled breaks of 10–15 minutes at a time. (*Id.*). Dr. Seymour opined that Plaintiff's impairments produce both good and bad days, which means she will likely miss more than four days of work per month. (*Id.* at 955).

At the September 2012 hearing, John W. Pollard, M.D., after reviewing the record, provided testimony as a medical expert. (R. at 50–55). After summarizing the record, he opined that Plaintiff does not meet or equal a listing. (*Id.* at 51–53). Dr. Pollard also concluded that Plaintiff could lift 20 pound occasionally, 10 pounds frequently, stand and sit six hours in an eight-hour day, and crawl, crouch, kneel and squat only occasionally. (*Id.* at 54). However, on cross-examination by Plaintiff's counsel, Dr. Pollard acknowledged that someone with Plaintiff's impairments— fibromyalgia, fatigue, obesity, and osteoarthritis in her knees—could have difficulty standing. (*Id.* at 54–55).

## V. DISCUSSION

Plaintiff contends that the ALJ's decision contains errors of law and is not supported by substantial evidence because the ALJ (1) did not properly assess her treating physicians' opinions, and (2) erred in finding that she can perform past relevant work. (Dkt. 17 at 11–15).

## A. ALJ Did Not Properly Evaluate the Treating Physicians' Opinions

Plaintiff asserts that the ALJ improperly evaluated the opinions of Drs. Lichon and Seymour. (Dkt. 17 at 11–14). Plaintiff argues that the ALJ's "reasons for rejecting the treating physicians' opinions that [Plaintiff's] ability to stand/walk through the work-day was limited are insufficient." (*Id.* at 12).

Plaintiff began monthly treatments with Dr. Lichon in September 2008. (R. at 618). In June 2009, Dr. Lichon submitted a fibromyalgia RFC questionnaire, in which he opined that Plaintiff's pain is severe enough to cause constant interference with the attention needed to perform even simple work tasks, and she is incapable of even performing low stress jobs. (*Id.* at 619). As a result of Plaintiff's impairments, Dr. Lichon estimated that Plaintiff can walk only ½ block before needing to rest, sit only 2 hours before needing to get up, and stand 15 minutes before needing to sit. (*Id.* at 620). She will likely miss more than four days of work per month because of her impairments. (*Id.* at 621).

In March 2010, Dr. Lichon completed a second fibromyalgia RFC questionnaire, in which he similarly opined that Plaintiff's pain and related emotional factors are severe and incapacitating enough to cause constant interference with the attention and detail needed to perform even simple work tasks. (R. at 651–53). Plaintiff can walk one block at best without rest, sit or stand only 15 minutes before needing to change position, can sit, stand, or walk less than 2 hours in an 8-hour workday, and is likely to miss more than four days a month. (*Id.* at 653–55). Dr. Lichon opined

that Plaintiff "is totally disabled [and] unable to work due to fibromyalgia [and] depression." (*Id.* at 656).

Plaintiff began quarterly treatments with Dr. Seymour in 2005. (R. at 952). In June 2012, Dr. Seymour completed a fibromyalgia RFC questionnaire, in which he opined that Plaintiff suffers from daily, severe pain, which, together with emotional factors, constantly interferes with the attention and concentration needed to perform even simple work tasks. (*Id.* at 953). He concluded that without rest, Plaintiff can walk 2 city blocks, sit 45 minutes, and stand 15 minutes. (*Id.* at 954). Dr. Seymour opined that Plaintiff's impairments produce both good and bad days, which means she will likely miss more than four days of work per month. (*Id.* at 955).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *accord Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). There-

fore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011), and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice," *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (citing 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1)) (other citation omitted).

In a terse, perfunctory 1¼-page analysis of the 958-page record, the ALJ rejected Drs. Lichon's and Seymour's opinions.[8] (R. at 21–22). His reasons are largely contained in a single sentence: "Based on medical expert testimony, the longitudinal record is in no way supportive of the assessments in [Drs. Lichon's and Seymour's opinions] nor is there objective support for greater functional limitations than those established herein above." (*Id.* at 22). This single sentence makes it near impossible to understand the ALJ's reasoning.[9] Instead, the ALJ's opinion must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court[ ] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young*, 362 F.3d at 1002 (citations omitted). To build a logical bridge, the ALJ must "sufficiently articulate his assessment of the

[8] The Appeals Council vacated the ALJ's first decision after he failed to conduct "a complete evaluation of the treating source opinions." (R. at 125–27).

[9] The ALJ also rejected Dr. Lichon's June 2009 opinion "due to insufficient dating." (R. at 22). While the opinion does not include a date, it was received by the Commissioner on June 27, 2009. (*Id.* at 617). And if the missing date was a determinative factor in the ALJ's decision to reject Dr. Lichon's opinion, the ALJ should have solicited additional information. *See Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (noting that "an ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable").

evidence to assure [the court] that he considered the important evidence and to enable [the court] to trace the path of his reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citation omitted).

Even giving the ALJ's reasons considerable latitude, his decision to give little weight to Drs. Lichon's and Seymour's opinions is legally insufficient and not supported by substantial evidence. First, the ALJ demonstrates little understanding of the effects of Plaintiff's fibromyalgia on her ability to work. Fibromyalgia "is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way [the] brain processes pain signals." Mayo Clinic: Fibromyalgia; *accord Williams v. Colvin*, 757 F.3d 610, 612 (7th Cir. 2014); *see also Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch."). "There are no laboratory tests for the presence or severity of fibromyalgia. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet*, 78 F.3d at 306. "The pain and lack of sleep associated with fibromyalgia can interfere with [the] ability to function at home or on the job." Mayo Clinic: Fibromyalgia. Shortly before the ALJ decided this case, the

Commissioner issued guidance for evaluating fibromyalgia claims that admonishes adjudicators to be aware of the fluctuating nature of symptoms, which will produce good and bad days, the need to evaluate credibility with care, and the importance of considering longitudinal records reflecting ongoing medical evaluation and treatment from medical sources. *See* Social Security Ruling (SSR)[10] 12–2p.

Thus, whether Plaintiff had normal range of motion, motor strength, reflexes and gait (R. at 22), does not undermine Drs. Lichon's and Seymour's fibromyalgia diagnoses or their opinions on her limitations. Indeed, these objective tests were likely used to *rule out other causes* of Plaintiff's chronic pain and fatigue. *See Johnson v. Colvin*, No. 13 C 1023, 2014 WL 2765701, at *7 (E.D. Wis. June 18, 2014) ("[T]he ALJ must ensure that the 'objective' evidence he considers is pertinent to the claimant's impairments."); *cf. Moon*, 763 F.3d at 722 (criticizing ALJ's reliance on "unremarkable" MRI as evidence that claimant's migraines were not debilitating; "Doctors use MRIs *to rule out other possible causes of headache*—such as a tumor—meaning that an unremarkable MRI is completely consistent with a migraine diagnosis"). Because no objective test exists for fibromyalgia, Plaintiff need not "prove her condition with objective data." *Holmstrom v. Metro Life Ins. Co.*, 615 F.3d 758, 768–69 (7th Cir. 2010).

---

[10] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

The Commissioner argues that the ALJ properly relied on the treatment notes indicating a normal spine, normal straight leg raising, and no sensory or motor loss because fibromyalgia is not always disabling. (Dkt. 25 at 7). But whether fibromyalgia is disabling *in other cases* does not undermine the treating physicians' opinions *in this case* that Plaintiff's fibromyalgia severely affects her ability to work.

Second, Drs. Lichon's and Seymour's opinions—that Plaintiff's pain and fatigue from fibromyalgia are severe enough to prevent her from working (R. at 618–22, 651–56, 952–56)—are supported by the record. Plaintiff constantly complained of severe pain and fatigue, and on examination, she consistently exhibited the trigger/tenderness points associated with fibromyalgia. (*Id.* at 577, 582, 583, 584, 586, 588, 618, 631, 633, 642, 644, 651–52, 759, 762, 771–72, 785, 797, 836, 896, 952). And Plaintiff's doctors tried a number of strong medications to alleviate her pain and fatigue. (*E.g. id.* at 582 (prescribing tramadol), 584 (increasing Lyrica dosage), 644 (noting that by December 2009, Plaintiff was taking 400mg of tramadol daily to alleviate pain), 774 (prescribing Flexeril and Lidoderm patches), 833 (prescribing cyclobenzaprine)); *see Stage v. Colvin*, —F.3d.—, No. 15-1837, 2016 WL 492333, at *4 (7th Cir. Feb. 9, 2016) (strong pain medication prescriptions substantiate pain allegations).

The ALJ contends that Plaintiff's fibromyalgia was "stable" in June 2010. (R. at 22). But "stable" merely means that Plaintiff's condition is unchanged. Indeed, "a person can have a condition that is both 'stable' and disabling at the same time." *Hemminger v. Astrue*, 590 F.Supp.2d 1073, 1081 (W.D. Wis. 2008). "Plaintiff could

have been 'stable' and non-functional, or 'stable' and fully functional." *Barnes v. Colvin*, 80 F. Supp. 3d 881, 889 (N.D. Ill. 2015). The ALJ never took the additional step to explain why the "stable" condition undermines the treating physicians' opinions.

The ALJ also appears to discount Plaintiff's allegations of pain as merely "engaging in some narcotic seeking behavior." (R. at 22). But Drs. Lichon and Seymour never concluded that Plaintiff's reports of pain were due to narcotic seeking behavior. *See Vasquez v. Colvin*, No. 13 C 6222, 2015 WL 5634049, at *12 (N.D. Ill. Sept. 23, 2015) ("Vasquez's regular physicians never suggested in their notes that her reports of pain were due to narcotic seeking behavior and always treated her medically verifiable symptoms as real."). And in their fibromyalgia RFC questionnaires, Plaintiff's physicians explicitly noted that she is *not* a malingerer. (R. at 619, 652, 953).

Third, the ALJ cannot reject Drs. Lichon's and Seymour's opinions just because they are at odds with the ME's opinion. (R. at 22); *see Gudgel*, 345 F.3d at 470 ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."). In any event, on cross-examination, Dr. Pollard acknowledged that he was evaluating only the objective data (R. at 55), which as discussed above, does not give a complete picture of the effects of fibromyalgia on Plaintiff's ability to work.

Finally, the ALJ's attempt to undermine Dr. Lichon's opinions because Plaintiff "no longer needed a cane as of March 2010" (R. at 22) is unavailing. Dr. Lichon's assessment was not based on Plaintiff's need to use a cane but instead on the pain and fatigue associated with her fibromyalgia. (*Id.* at 618, 651–52). Indeed, in his RFC questionnaires, Dr. Lichon acknowledged that Plaintiff did *not* need a cane or other assistive device to stand or walk. (*Id.* at 620, 654). Further, that Plaintiff needed a cane on occasion is consistent with the "fluctuating nature of [fibromyalgia] symptoms, which will produce good and bad days." SSR 12-2p; (*see* R. at 52 (ME testifying that Plaintiff "sometimes" uses a cane), 954 (Dr. Seymour stating that Plaintiff needs a cane to ambulate "on occasion")).

On remand, the ALJ shall reevaluate the weight to be afforded Drs. Lichon's and Seymour's opinions. If the ALJ finds "good reasons" for not giving the opinions controlling weight, *see Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010), the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), in determining what weight to give the opinions.

## B. Other Issues

Because the Court is remanding to reevaluate the weight to be given to the treating physicians' opinions, the Court chooses not to address Plaintiff's other argument that she cannot perform her past work. (Dkt. 17 at 14–15). However, on

remand, after determining the weight to be given the treating physicians' opinions, the ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). Finally, with the assistance of a VE, the ALJ shall determine whether Plaintiff can perform her past work or whether there are jobs that exist in significant numbers that Plaintiff can perform.[11]

---

[11] Given the history of this case, the Appeals Council should consider assigning a new ALJ.

# VI. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse or remand [17] is **GRANTED**, and Defendant's Motion for Summary Judgment [24] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: February 25, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge